**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 2:18-cr-00257-DCN |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| LARRY EDWARD CARTER, JR., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on a motion to suppress filed by Larry Edward Carter, Jr. ("Carter"). Based on the foregoing, the court grants the motion to suppress.

## I.  BACKGROUND

This motion arises out of a traffic stop of Carter conducted on Thursday, June 1, 2016 by Officer Kevin Whitfield ("Whitfield") of the North Charleston Police Department ("NCPD"). The thirty-minute stop concluded with NCPD officers searching Carter's vehicle and finding a gun and bullets before placing Carter under arrest. A later search of Carter after his arrest revealed that he was carrying narcotics. ECF No. 45, Tr. 16:1. Recordings from the police car's dashboard camera ("dashcam") of the stop indicates that Whitfield pulled Carter over due to his concerns about Carter's dark window tint and his suspicions of his involvement in a drug sale. At the hearing on this suppression motion, the government argued instead that the search of the vehicle was based on probable cause that had been provided several days earlier by a confidential informant ("CI"). The following is a detailed summary of the events, based on the dashcam video and the testimony of Whitfield

and Agent Frank Preston ("Preston") (together, "the officers") at the suppression hearing.

Preston is a senior special agent with the Department of Justice's Bureau of Alcohol, Tobacco, and Firearms ("ATF"). Tr. 4:25–5:3. Whitfield has worked for the NCPD for over five years and is currently a detective with the gang unit. Tr. 29:5–7. In May 2017, Whitfield was informed by a patrol officer that he had arrested a subject who "wanted to do something to help work off his charges." Tr. 29:18–20. Neither of the officers had ever met this person or used him as a CI before. After agreeing to work as an informant, the CI had several meetings with Whitfield and gave the officers a list of people from whom he could buy drugs, including the name "King," who frequently sold heroin to the CI. Tr. 30:2–9. On or about Saturday, May 27, 2017, a day or two after Whitfield and the CI first met, the CI called Whitfield to tell him that he had received text messages from King in which King asked the CI to participate in an armed robbery of a hotel that night. Tr. 30:12–20, 43:7–19. The CI sent Whitfield screenshots of the following text messages, which had "Yesterday 11:03 PM" at the top of the screen:

> CI's Phone: [CI] is asleep what's up[1]
> King: Tell him I may have a job for him
> CI's phone: Ok I will tell him! What's it doing
> King: A quick in and out 211[2] the same thing at his old job but I will supply him with the gun and Ill be his lookout and get away driver
> CI's Phone: I will talk to him when he gets up in the am. How big is the take?
> King: We'll do a 60% 40% split…I'll get the %60
> King: It's at his old job yall know what's usually in the safe.[3]

---

[1] The CI's girlfriend sent the initial responses to King's messages, using the CI's phone. Tr. 44:21–45:2.
[2] Preston explained that a quick in and out 211 is an armed robbery. Tr. 10:25–11:2.

> CI's Phone: OK
> CI's Phone: When are you wanting to do this?
> King: Tonight I got zip ties and everything mask and all

ECF No. 35-1.  After the CI sent these messages to Whitfield, Whitfield told the CI to

try and stall King.  Tr. 30:21–25.  The following is the CI's response to King after

talking with Whitfield:

> CI's Phone: There are a couple factors I'm gonna have[e] to figure out
> before we can do this bubba. 1, I have to find out when Kyle's
> assistant is doing the nigh[t].  It would definitely be better to hit him
> tha[n] kyle. Kyle would take a bullet before he lets money go. John
> will give it up at the sight [o]f the gun. Feel me. And 2, I was told they
> put cameras in last week. I need to know where exactly they are and
> we need something we can ditch when this is over if that's true. Let
> me work on this. Plus today is a holiday which means more cops on
> the roads tonight, which means a quicker response time [if] something
> does go wrong. Tuesday or Wednesday would in my mind be a better
> pick of when. Let me know what you think. But in 100% game. Let
> me find out some details on if anything has changed though. I [] still
> have 2 guys working there I can talk to.
> King (at 11:55 AM): Ok Wednesday would be cool.

Id.  Although the screenshots of these text messages do not have any dates on them,

the CI sent Whitfield the screenshots on Saturday, May 27, 2017, indicating that the

texting conversation between King and the CI had taken place on Friday, May 26,

2017—"yesterday," as indicated at the top of the screenshot.

On Wednesday, May 31, 2017, the day that the CI and King had agreed upon

for the robbery, Whitfield and the CI drove an unmarked vehicle to an area where the

CI expected to find King.  Tr. 31:13–17.  Between 2:00 PM and 3:00 PM, they slowly

drove by the house where King was located at least three times in the course of five to

ten minutes.  Tr. 44:24–45:19.  As they drove by, the CI identified for Whitfield the

---

[3] King's request to rob the CI's "old job" refers to the Economy Inn and Suites in
North Charleston, where the CI used to work.

person that he knew as King, as well as King's car—a tan Grand Marquis that had darkly tinted windows and was missing the front grill. Tr. 32:14–33:8. Whitfield estimated that he and the CI were "maybe ten yards" from the porch where King was located. Tr. 47:4–11. Whitfield testified that he was able to see both King and the car very clearly. Tr. 33:1–8.

Whitfield then dropped off the CI, returned to the house where King was located, and waited for King to leave. At some point, Whitfield left to use the rest room, and when he came back, King's car was gone. Whitfield returned to the house the next day, Thursday, June 1, 2017. Whitfield "sat on the house again, went off to use the rest room," and when he came back, the car had left. Tr. 33:20–34:3. Whitfield then began looking for the vehicle. He stated that he saw the Grand Marquis driving down McMillan Avenue and was confident it was the same vehicle due to its color, its darkly tinted windows, and its missing grill. Tr. 34:5–9. Whitfield followed the vehicle, which Carter[4] was driving, into the parking lot of the Money Man Pawn shop on McMillan Avenue, North Charleston. Carter parked next to a black SUV. Tr. 35:15–17. Whitfield then parked behind Carter's vehicle at an angle that prevented it from exiting and that partially blocked the car parked next to Carter. Whitfield testified at the suppression hearing that, as soon as he approached

---

[4] The CI had previously identified the person he knew to be King to Whitfield by pointing him out as they drove by his house. Days later, when Whitfield stopped Carter's vehicle, he recognized the driver with "100% certainty" as the person whom the CI had identified as King. Thus, for the remainder of this order, the court refers to him as "King" when discussing anything that occurred before the stop on June 1, 2017, and refers to him as "Carter" when addressing what occurred during and after the stop.

Carter's vehicle, he recognized the driver and "knew 100 percent that's the guy that was known as King." Tr. 35:17–23.

The Dashcam video recording of the traffic stop reveals that, after initiating the stop, Whitfield asked Carter for his license and registration and informed him about the potentially problematic tint to his car windows. At minute 1:50, another officer arrived on the scene. At minute 2:45, Whitfield told Carter to stay in the car after Carter asked to get out due to the heat. Four minutes into the video, Whitfield can be heard calling someone. At minute 5:30, he can be heard on the phone with someone saying that he believed that Carter pulled up to "make a [drug] sale" and asked "should I write a warning and let him go or search the car?" At minute 7:15, Whitfield asked Carter to step out of the vehicle and introduced himself as an officer with the gang unit; Whitfield asked if Carter had any guns, to which Carter responded "no sir." At minute 7:35, Whitfield told Carter he was going to pat Carter down; when Carter objected, Whitfield affirmed that he was not searching Carter, but merely giving him a pat-down.

At minute 7:50, Carter inquired about whether he would receive a ticket, to which Whitfield replied that he was still deciding whether to write a ticket or a warning. At minute 8:30, Whitfield asked Carter if he could search the car for "any weapons, guns, stuff like that." In response, Carter said "no sir, I don't consent to no search," to which Whitfield replied "that's fine, that's your right, I'm not going to go in your car if you say not to." Minute 8:40 to 11:40 of the recording sounds as though Whitfield was talking to someone else on the phone; at 11:20 he inquired into whether there was a K-9 unit available. At 11:45, Whitfield stated that he would get

5

his tint meter in order to inform Carter of the shade of the tint. Carter then said "so if it's all right then I'm free to walk away?" From minute 12 to 13:20, Whitfield explained that Carter was "detained for the window tint" and was not free to leave until Whitfield released him. Minutes 14 and 15 involved further discussion of the tint violation.

From minute 16–21:50 there was mostly silence, other than the woman in the SUV next to Carter asking to leave, which Whitfield allowed. At minute 22, Whitfield can be heard talking to another officer saying that he pulled Carter over for a window tint, that he's a drug dealer and that he was one of "our targets" who came here to buy or make a sale. At minute 22:30, Whitfield called and asked for a supervisor upon Carter's request. At minute 23:25, Whitfield said "I've searched cars for less." At minute 24:10, Carter reiterated that he does not and did not consent to the search. At minute 25, Whitfield said that "we're going to conduct a search of the car," and at 25:40 officers are heard asking Carter if he has a permit and why he is carrying a gun under his seat.

At some point in these last few minutes of the stop, a K-9 unit appeared and a drug dog conducted a sniff search around the vehicle; although none of was captured by the dashcam footage, the officers claim that the drug dog alerted, after which they conducted a search of the vehicle. They found a firearm under Carter's seat, which turned out to be stolen, and some bullets in his back seat and inside the lid of the gas tank. Tr. 38:19–25. At minute 25:40, another officer who had arrived on the scene asked Carter why he carried bullets in his gas tank. Carter denied knowing that the bullets were in the car, and claimed that, although he owns the car, he does not

always drive it.  At minute 30:55, Whitfield is heard saying "I arrested my target . . . King . . . no different guy actually . . . his name is Larry Carter."

Carter was arrested for illegal possession of the pistol.  When booked at the jail, Carter was found to have 24 morphine pills, 12 Xanax pills, and 0.44 grams of cocaine on his person.  Carter was indicted on four counts.  The first three counts—possession with intent to distribute a quantity of morphine, carrying a gun in relation to a drug trafficking crime, and felon in possession—are from this June 1, 2017 stop. The fourth count, for possession with intent to distribute a quantity of heroin, is from June 6, 2017, after Carter was let out on bail.  The motion to suppress addresses only the first three counts from June 1, 2017.  Carter filed his motion to suppress on July 30, 2018, ECF No. 33, and the government filed its response on August 9, 2018, ECF No. 35.  The court held an evidentiary hearing on the motion on September 18, 2018. ECF No. 41.  The government filed supplemental briefing on October 22, 2018, ECF No. 46, and Carter filed his supplemental briefing on November 16, 2018, ECF No. 47.  The motion has been fully briefed and is ripe for the court's review.

## II.  DISCUSSION

Carter's motion to suppress challenges the seizure of the evidence in his car on the following grounds: (1) there was not reasonable suspicion to initiate the stop; and (2) the stop was impermissibly extended to allow time for the K-9 unit to arrive. Carter also requested a hearing to ascertain the reliability of the K-9's training and whether or not he properly "alerted."   At the hearing on the motion to suppress, the government chose not to conduct an assessment of the K-9's training and whether it properly alerted, or to put forth evidence that probable cause arose after the stop was

initiated that would have warranted the search of the vehicle. Rather, the government's position is that the officers had probable cause to search Carter's vehicle from the moment they stopped him because of the prior evidence they had obtained from the CI. The court disagrees.

The Fourth Amendment guarantees the right of the people "to be secure in their persons, houses, papers, and effects." U.S. Const. amend. IV. "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, (1967). Because the officers searched Carter's vehicle without a warrant, the court must determine whether (1) the search was justified pursuant to the rules governing Terry stops, or (2) whether the CI's statements provided probable cause for the officers to search the vehicle under the automobile exception to the warrant requirement. The court finds that neither exception applies and that the search violated Carter's Fourth Amendment rights.

### A. Traffic Stop

Carter's vehicle was searched during the course of a traffic stop. A traffic stop is a "seizure" within the meaning of the Fourth Amendment and must be reasonable under the circumstances. See Delaware v. Prouse, 440 U.S. 648, 653–54 (1979). Likewise, a warrantless search of a vehicle during a traffic stop is "per se unreasonable" unless one of the specifically established exceptions is present. Schneckloth v. Bustamonte, 412 U.S. 218, 219, (1973). The constitutionality of a traffic stop is assessed under the two-prong standard in Terry v. Ohio, 392 U.S. 1

(1968). First, the articulated basis for the traffic stop must be legitimate. See United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992). Second, the police officers' actions during the traffic stop must be "reasonably related in scope" to the basis of the seizure. Id.

This first prong is satisfied "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." See Arizona v. Johnson, 555 U.S. 323, 327 (2009). A "vehicular violation" includes a failure to comply with traffic laws. Whren v. United States, 517 U.S. 806, 809–810 (1996). According to the second Terry prong, "[i]f a police officer wants to detain a driver beyond the scope of a routine traffic stop, [ ] he must possess a justification for doing so other than the initial traffic violation . . . [and] a prolonged automobile stop requires either the driver's consent or a reasonable suspicion that illegal activity is afoot." United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008). In order to then conduct a search of the driver's vehicle during the stop, the officer must have probable cause to believe that contraband is contained somewhere within the vehicle. United States v. Ross, 456 U.S. 798, 809 (1982).

Although Whitfield was motivated by reasons other than the window tint to commence the traffic stop, the court notes that police officers are allowed to conduct "pretext searches," and the Supreme Court has "foreclose[d] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." Whren, 517 U.S. at 813. Courts should "simply ask whether the circumstances, viewed objectively, justify the action." United States v. Palmer, 820 F.3d 640, 644–55 (4th Cir. 2016); see also United States v. Johnson,

2016 WL 4592377, at *12 (D. Md. Sept. 2, 2016) (holding that when a stop is not a routine traffic stop based on "a suspected motor vehicle infraction," but is rather a "stop based on a suspected narcotics violation . . . such a stop is nonetheless described as a traffic stop . . . [and] <u>Terry</u>'s dual inquiry analysis applies").

Even if Whitfield's decision to stop Carter was supported by reasonable suspicion that Carter's window tint violated South Carolina law, the government would still need to demonstrate either that probable cause to search the vehicle arose during the course of the stop, or that the officers had independent probable cause to conduct the search based on the statements from the CI, in order to satisfy the second <u>Terry</u> prong. Because the court finds that there was not probable cause to search the vehicle under either option, the court declines to make findings regarding whether the initial stop based on the alleged window tint violation was justified.

**B. No Probable Cause Arose During the Stop**

At the hearing on the motion to suppress, the government decided not to put forth evidence regarding the validity of the K-9's alleged alert to the presence of contraband in the car. Rather, the government argues that Whitfield had probable cause to search the car, not due to the K-9's alert, but due to the information previously provided by the CI. For the sake of thoroughness, the court explains its finding that no probable cause to search the vehicle arose after the stop commenced, before analyzing whether the CI's tip provided probable cause for the search.

The second prong of the <u>Terry</u> test asks if the officer took impermissible actions after initiating the traffic stop. "If a police officer wants to detain a driver beyond the scope of a routine traffic stop, [ ] he must possess a justification for doing

so other than the initial traffic violation . . . [and] a prolonged automobile stop requires either the driver's consent or a reasonable suspicion that illegal activity is afoot." United States v. Branch, 537 F.3d at 336. "Evidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation." Terry, 392 U.S. at 19. Officers may conduct certain safety-related checks such as requesting a driver's license and vehicle registration, and checking for criminal records and outstanding arrest warrants, "so long as" these unrelated inquires do not "measurably extend the duration of the stop." Rodriguez v. United States, 135 S. Ct. 1609, 1615 (2015) (quoting Johnson, 555 U.S. at 333). "Authority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez, 135 S.Ct. at 1614.

At least 25 minutes passed between when Whitfield stopped Carter and when the officers searched his car, after the police K-9 allegedly alerted to something in the car. Whitfield should have completed the traffic stop for the window tint long before the drug dog arrived, as issuing a warning or a citation for a window tint violation should be a fairly routine and quick procedure. Here, Whitfield took Carter's license and registration but refused to give him a warning or citation. Whitfield instead intentionally chose to extend the stop to wait for a K-9 unit; his intent is indicated by the call he made at minute 5:30 of the stop to ask Preston whether he should "write a warning and let him go or search the car" because he believed that Carter was about to conduct a narcotics sale. The intentionality of the extension is further indicated by the many minutes that the officers and Carter spent standing around waiting for the

K-9, and by Whitfield's refusal to decide whether to issue Carter a citation or a warning for the window tint.

Other than the CI's tips, which are discussed below, the government has not identified anything that occurred during the actual stop that provides enough reasonable suspicion of Carter's criminal activity that could justify extending the stop. The government argues that Carter's request to exit the car due to the heat indicated his desire to put distance between himself and the drugs in the car. The court does not see the merit of this argument, considering that Carter did not attempt to run and was cooperative throughout the entire process.

The government also contends that Carter appeared "nervous," which created reasonable suspicion that he was engaged in illegal activity. However, the video clearly shows that Carter was composed throughout the entire stop, and that he and Whitfield communicated to one another calmly and respectfully. Certainly, the video of the traffic stop is "the most reliable evidence of the detainees' demeanor." United States v. Rodriguez–Escalera, 2018 WL 1178359, at *5 (7th Cir. Mar. 7, 2018) (holding that the court was not required to credit an officer's testimony that a defendant "appeared nervous" where the court's own review of the video footage of the traffic stop led it to determine that the defendant was not acting "suspiciously nervous."). Furthermore, nervousness "is an unreliable indicator, especially in the context of a traffic stop." United States v. Bowman, 2018 WL 1093942 (4th Cir. Mar. 1, 2018). The Bowman court reiterated that the Fourth Circuit has recognized "on multiple occasions" that a driver's nervousness "is not a particularly good indicator of criminal activity, because most everyone is nervous when interacting

with the police." Bowman, 2018 WL 1093942, at *8, (citing Palmer, 820 F.3d at 651). If Carter had shown minimal signs of nervousness, they would have been excused under Bowman. However, the dashcam video does not reveal any nervousness on the part of Carter—only frustration at being detained and a continued assertion of his right to be free from search and seizure.

Given that there was no reason from the circumstances of the stop itself to justify the extension of the stop or the search of the vehicle, the court must consider whether the CI's information was sufficient to justify the search.

### C. Automobile Exception Based on CI's Information

The government argues that Whitfield had probable cause to stop and search Carter under the automobile exception to the warrant requirement, based on the CI's information alone. Under the automobile exception, "police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains . . . evidence of a crime." United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004) (citing Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (per curiam)); see California v. Acevedo, 500 U.S. 565, 569 (1991) ("The police may search an automobile and the container within it where they have probable cause to believe contraband or evidence is contained."). "This exception to the warrant requirement was first set forth [in] Carroll v. United States, 267 U.S. 132 [ ] (1925), [where] the Court recognized that the privacy interests in an automobile are constitutionally protected, [but] that the ready mobility of the automobile justifies a lesser degree of protection . . . ." California v. Carney, 471 U.S. 386, 390 (1985). The automobile exception "is not limited to the search of automobiles that are

actually used during the commission of a crime," but also "allows for the search of a readily movable automobile if there is probable cause to believe that evidence of a crime will be found in the automobile." United States v. Tribble, 2007 WL 1876500, at *1–4 (E.D.N.Y. June 28, 2007).

"In this class of cases, a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained." United States v. Ross, 456 U.S. at 809. In Illinois v. Gates, 462 U.S. 213, 238 (1983), the Supreme Court held that probable cause exists when, "given all the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." See also Ornelas v. United States, 517 U.S. 690, 696 (1996) (finding "probable cause to search as existing where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found"). This is a "more flexible, commonsense approach" that relies upon the "totality of the circumstances." United States v. White, 549 F.3d 946, 947 (4th Cir. 2008).

The Supreme Court has acknowledged that "a rigid judicial test would hamper legitimate police work" and that "tips from informants are critical in solving crimes and protecting the public." Id. at 948 (citing Gates, 426 U.S. at 237). Determining whether probable cause existed based on information from a CI has not been "reduced to a neat set of legal rules." Id. (internal quotations omitted). However, the Fourth Circuit has found that "[a]n informant's tip is rarely adequate on its own to support a finding of probable cause" and that "[o]ne important factor in determining whether an informant's tip has established probable cause is the degree to which the

arresting officer can corroborate that tip." United States v. Miller, 925 F.2d 695, 698 (4th Cir. 1991); see e.g., United States v. Lalor, 996 F.2d 1578, 1581 (4th Cir. 1993) ("An important factor in determining whether an informant's report establishes probable cause is the degree to which it is corroborated."); United States v. McCraw, 920 F.2d 224, 227 (4th Cir. 1990) ("A combination of tips from an informant and first-hand corroborative observation of suspicious activity will provide probable cause [ ].").

A review of Supreme Court and Fourth Circuit jurisprudence reveals that in most cases where courts find that probable cause supported a search based on a CI's tip, the police have either: (1) successfully used that CI on previous occasions, and/or (2) have received or observed sufficient information to corroborate the CI's statements before obtaining a search warrant or conducting a warrantless search. See, e.g., Maryland v. Dyson, 527 U.S. 465 (1999) (upholding a search based on a tip from a "reliable" CI that was corroborated by law enforcement observations); United States v. Reddicks, 237 F. App'x 826, 827–31 (4th Cir. 2007) (relying on a tip from a CI who had "given information leading to four convictions and the capture of a fugitive within the past several years"); United States v. Davis, 67 F. App'x 771, 777 (4th Cir. 2003) (upholding the district court's denial of the motion to suppress because the search affidavit was based on "information from proven reliable confidential informants" and "physical surveillance" of criminal activity); United States v. Avery, 141 F.3d 1160 (4th Cir. 1998) (finding that probable cause supported a search of a vehicle when agents heard the reliable CI conduct a drug purchase from the defendants before the defendants drove away); United States v. Sumler, 155 F.3d

563, at *3 (4th Cir. 1998) (unpublished) ("We have no trouble concluding that the officers had probable cause to believe [the defendant] was transporting heroin in his vehicle" after the "officers corroborated most of the informant's tip.").

In order for Whitfield's warrantless search of the car to be upheld under the automobile exception based on the CI's tip, Whitfield would have needed probable cause that the vehicle contained contraband or evidence of a crime. The only crime that the officers could have deduced from the CI's info was that on Friday, May 26, he and King had conspired to commit an armed robbery of a hotel on Wednesday, May 31. While the CI had informed the officers that he sometimes purchased heroin from King, whom he said was a known drug dealer, the government offered no evidence that the CI had indicated with any particularity that King was likely to have drugs with him on June 1, 2017, when he was searched.[5] This is also not a situation in which the police had probable cause to believe that stolen goods could be found in Carter's car, as the robbery that had been planned for May 31, 2017 had not actually occurred when Carter was arrested the next day. The only "crime" which the court can surmise that Whitfield suspected Carter of committing was the crime of conspiracy to commit armed robbery. Thus, the court must consider whether, based

---

[5]     Whitfield's phone call during the stop revealed that he thought that Carter was conducting a drug sale. However, as discussed above, this argument was not developed at the hearing or in the supplemental motions. No evidence was put forth about the validity of the K-9's "alert" to the presence of contraband in the car. As the court has noted, there is insufficient evidence that Carter was about to conduct a drug sale in the parking lot to justify the extension of the stop and/or the search of his vehicle. The fact that a person that a CI had identified as a drug dealer had parked next to another vehicle in a public parking lot does not, without more, demonstrate that he might possess contraband in his vehicle.

on the totality of the circumstances, there was probable cause that Carter's vehicle contained evidence of the crime of conspiracy to commit armed robbery.

In making this probable cause determination, the court must consider whether the CI has proved reliable in the past, and if not, whether there was any other indicia of the CI's reliability or corroboration of Carter's criminal activity. Here, the CI had only been signed up by the officers about one week before Carter's arrest and had never acted as a CI for them before. Even though he had not yet proven himself as a reliable CI, the officers could still rely on a tip from the CI if there was any type of corroboration of his statements or indication of Carter's criminal activity. See Miller, 925 F.2d at 699. However, based on a thorough review of Fourth Circuit case law on this issue, the court finds that there was not sufficient corroboration. The court's conclusion that the search was not supported by probable caused is based on (1) its finding that the text messages did not provide enough corroboration of the CI's statements and (2) its assessment that the circumstances surrounding Carter's search did not sufficiently corroborate the officer's suspicions that Carter had evidence of the conspiracy to commit armed robbery in his vehicle.

### 1. The Text Messages Did Not Provide Sufficient Corroboration

The court first considers whether the screenshots of the text messages provided probable cause that Carter had evidence of a crime in his vehicle. The CI claimed that the text messages were sent by King. According to Whitfield, the man that the CI identified as King turned out to be Carter. However, the screenshots did not identify the sender of the text messages or show a phone number that the officers could investigate; thus, the officers had to rely solely on the CI's statement that the

messages were sent by King. The court finds that the screenshots did not provide sufficient corroboration that King (aka Carter) had conspired to commit armed robbery and would have had evidence of that conspiracy in his vehicle on June 1, 2017, because the officers would not have known that King had sent the messages except for the CI's statement that the messages were from King. In other words, the evidentiary value of the screenshots is based solely on the CI's statement that the texts were sent from King, and thus the screenshots have the same evidentiary value as the CI's other uncorroborated statements that King (aka Carter) had conspired with the CI to commit armed robbery. Further, the screenshots did not show the date and time that the messages were sent. Because the officers had to rely solely on the CI's own assertions about the date and sender of the messages, the court finds that the screenshots, standing alone, did not contribute enough additional evidence to the CI's statements in order to provide probable cause in support of the warrantless search.

The government points to United States v. Blauvelt, 638 F.3d 281, 284 (4th Cir. 2011) in support of its argument that text messages need not be verified in order for police to rely on them for probable cause to conduct a search. ECF No. 46 at 7. Yet Blauvelt differs substantially from the matter currently before this court. In Bauvelt, a woman, Erin Ruley ("Ruley"), informed police that her ex-boyfriend, Christopher Blauvelt ("Blauvelt"), possessed explicit photos of her 14-year-old sister on his computer. Ruley had accessed Blauvelt's email account and found emails containing pictures of her sister wearing lingerie in "pornographic poses" and snorting cocaine, with the interior of Blauvelt's home visible in the background. Id. Ruley printed a screen shot of Blauvelt's email inbox showing that the images were

sent from his cell phone.  Id.  The officers viewed the images and received

confirmation from the younger sister that she was in the photos.  The other minor

child in the photograph affirmed that he had taken the pictures of Ruley's sister with

Blauvelt's cell phone and had then returned the phone to Blauvelt.  The younger sister

stated that Blauvelt had given them alcohol and cocaine.

The officers obtained a search warrant, which Blauvelt later claimed was not

based on probable cause.  The Fourth Circuit found that "although law enforcement

agents did not independently verify Blauvelt's ownership of these accounts before

applying for the search warrant, they indicated in the supporting affidavit that Ruley

had a previous relationship and shared a child with Blauvelt."  Id. at 288.  The court

also relied heavily on the corroboration from the minors in the photographs that the

pictures were taken at Blauvelt's house, with his phone, and concluded that "this

evidence was more than sufficient to warrant a man of reasonable prudence in the

belief that contraband or evidence of a crime will be found in the place to be

searched."  Id. (internal quotations omitted).

Although Blauvelt involved a screenshot of an unverified email account,

similar to the unverified screenshots of the CI's phone in this case, there was much

more substantial corroboration of the source of the screenshots of Blauvelt's email

than exists in the case before this court.  In Blauvelt, the sender of the messages was

identified by name by his ex-girlfriend.  Further, Ruley's statement that the pictures

were taken on Blauvelt's phone was corroborated by the other minor who stated that

he took the photos on Blauvelt's phone.  Id. at 288.  Additionally, unlike in the

current case, the officers in Blauvelt "corroborated Ruley's information by actually

19

viewing both the images and the inbox for Blauvelt's email account." Id. Finally, the images show that they were taken in Blauvelt's house, and the minors stated that Blauvelt had given them drugs in his home.

Blauvelt clearly contrasts with the current case, in which the CI could not identify King by his real name and had no personal relationship with him that could lead the officers be sure that it was King/Carter texting the CI about the robbery. See also United States v. Kinison, 710 F.3d 678 (6th Cir. 2013) (finding that probable cause supported the search of defendant's home for child pornography after being informed by the defendant's girlfriend that he was sending her "disturbing text messages" about his desire to abuse children and that he was viewing child pornography videos on his home computer). There were no independent witnesses to support the text messages' evidence of a crime, unlike in Blauvelt, where the minor children confirmed that there were illicit photographs taken on his phone and that he had given them drugs and alcohol. The officers had no evidence to corroborate the CI's statements other than screenshots of text messages from an unknown source which the CI claimed was King. Thus, the court finds that other corroborating information or evidence of criminal activity was required for the officers to have probable cause to justify a warrantless search of Carter's vehicle.

### 2. Whitefield's Observations Did Not Provide Corroboration

Even though the text messages do not sufficiently corroborate the CI's statements, the court could still find that probable cause supported the search if Whitfield had observed anything else that confirmed the CI's statements or indicated

that Carter was likely to have evidence of a crime in his vehicle when he was searched. However, the court finds that there was no such corroboration.

### i. Corroboration of Statements from New CIs

The government cites United States v. Miller to argue that (1) "the fact that an informant is new or has not previously provided information to the police does not render him or her inherently unreliable," and that (2) the Supreme Court adopted the "totality of the circumstances" approach to preclude police officers from needing to conduct an "independent investigation" before commencing a search based on an informant's tip. ECF No 46 at 6, 9. While Miller did involve an informant who had not previously operated as a CI, the officers in Miller "corroborated a substantial portion of [the CI's] tip through personal observation." Miller, 925 F.2d at 696. The CI had informed the investigating officer that Bernice Miller ("Miller") would be carrying a shipment of drugs by bus from New York City to Winston-Salem, North Carolina. The officer knew that Miller had previously been arrested for possession of cocaine, and the CI identified a picture of Miller. The CI notified the officer on the day that Miller's bus was scheduled to arrive and informed him that Miller would be wearing blue jeans and a blouse and carrying a brown tote bag with a shoulder strap. The officer observed the passengers exit the bus from New York, identified Miller, and confirmed that she was wearing blue jeans and a blouse and carrying a brown tote bag, just as the CI had predicted.

The district court granted Miller's motion to suppress the heroin that the officer found after searching Miller's tote bag because the officer had not conducted an independent investigation based on the CI's tip before searching Miller. Id. at 698.

The Fourth Circuit reversed the district court, finding that arresting officers are not required to conduct independent <u>investigations</u> to corroborate a CI's information; rather, a tip from a new CI can be corroborated by an officer's <u>observations</u> that support the credibility of the CI's information.  <u>Id.</u> at 698–99 (emphasis added).  The Fourth Circuit reiterated that "[a]n informant's tip is rarely adequate on its own to support a finding of probable cause" and that an "important factor in determining whether an informant's tip has established probable cause is the degree to which the arresting officer can corroborate that tip."  <u>Id.</u> at 698.  The Fourth Circuit found that "the informant's tip, which was substantially corroborated by [the officer's] observations, established probable cause for him to arrest [Miller]."  <u>Id.</u> at 699.

Whitfield was not required to conduct an entirely independent investigation of King after receiving the CI's tip.  However, in order to have probable cause to search Carter's vehicle, he needed more than just a statement from an unproven CI.  Unlike in <u>Miller</u>, Whitfield did not know whether "King" had any criminal record—he did not even know King's real identity.[6]  More importantly, the CI had not given

---

[6] The government also cites <u>United States v. Williams,</u> 10 F.3d 1070 (4th Cir. 1993) to argue that the informant need not have identified Carter by name and that it was sufficient for the CI to identify him by his street name and then point him out in person to Whitfield.  ECF No. 46 at 6 (quoting <u>Williams,</u> 10 F.3d, at 1076, "A police officer is not required to know the suspect's name or to have a particularized description of his person in order to have probable cause to arrest the suspect.").  While the court does not dispute this argument, the court's decision to grant the motion to suppress is based on the overall lack of probable cause, not solely because the CI had not been able to identify King's real name.  Notably, however, the <u>Williams</u> court's finding of probable cause was based on the officer's personal observations of obviously suspicious activity after the officers received a tip regarding a vehicle that had been involved in several bank robberies.  <u>Williams</u>, 10 F.3db at 1075–76.  The facts in <u>Williams</u> provided much greater support for a probable cause finding than in the case currently before this court.

Whitfield any additional information about the robbery plan which could have been confirmed by Whitfield's observations of Carter. In <u>Miller</u>, the CI had informed the officer that the defendant would be (1) carrying drugs, (2) on a certain day, (3) riding a certain bus, (4) wearing a specific outfit, and (5) carrying a particular handbag. The officer was able to confirm four of these facts by observation before even approaching the defendant—the day, the bus, the outfit, and the bag. Thus, because the officer confirmed every other detail that the CI had told them about the circumstances of the defendant's drug-smuggling, the Fourth Circuit found that the police rightly relied upon the CI's final piece of information—that the defendant was carrying drugs with her—and had probable cause to search her bag for the drugs.

In the instant case the CI: (1) told the officers that King wanted them to commit a robbery on May 31; (2) showed the officers screenshots of the texts from an unknown number whom the CI claimed was King; and (3) identified King and his car to Whitfield in person. Yet other than this information, the CI did not provide the officers with any information regarding King's possession of evidence of a crime that could be confirmed by the officers before they searched his vehicle. The court takes this opportunity to distinguish between (1) the CI identifying King and his vehicle for Whitfield, and (2) actual corroboration of a CI's statements, as occurred in the other cases cited in this order. Merely identifying King and his vehicle did not corroborate the CI's tip that King had conspired to rob the hotel, and it does not support the government's argument that the officers had probable cause to believe that tools for an un-executed robbery would be in that vehicle. The CI merely gave Whitfield an in-person identification of the man that he referred to as King and stated that the

Grand Marquis in the driveway was King's vehicle. That knowledge—of King's appearance and which car he drove—did not in any way corroborate the idea that King was carrying around a gun, zip ties, and a mask.

If the CI had informed the police that, at a specified time on June 1, 2017, King would arrive at the Money Man Pawn shop in North Charleston and would be carrying tools for the robbery in a tan Grand Marquis with dark windows and a missing front grill, then that might support probable cause. In other words, if the CI had given details that had been confirmed—such as the date, time, location, and the container in which the contraband would be transported, as existed in Miller—then the officers might have had probable cause to believe that the vehicle contained evidence of a crime. Yet, unlike in Miller, the CI here did not predict that King/Carter would be in a specific location on a specific date, using a particular mode of transportation, wearing a particular outfit, and carrying contraband. In fact, the CI in the current matter did not actually tell the police that King would have contraband or evidence of a crime in his car. Rather, the government asks the court to infer, without any further corroboration, that King would have been carrying tools for an armed robbery in his car on June 1, 2017 because King had previously offered to drive and provide the tools for an armed robbery that had been planned for the previous day but never occurred.[7] The court declines to make such a tenuous inference without additional evidence.

Additionally, the CI gave his tip to the officers on Saturday, May 27 regarding the robbery that was to occur on Wednesday, May 31. The arrest occurred on

_____

[7]    See Section III.A.2.i for the court's determination that those text messages do not provide independent corroboration for the search.

24

Thursday, June 1; yet the government has presented no evidence of any communication between the CI and the officers explaining why the robbery did not occur on May 31 or whether it had been rescheduled for a later date. Still, the government claims that Whitfield had probable cause on Thursday, June 1 to believe that King's car would contain the gun, mask, and zip ties that he had promised to provide for the Wednesday, May 31 armed robbery, even though (1) the robbery never took place, and (2) the CI had not provided any indication that the robbery had been rescheduled, such that it would be reasonable to believe that King was carrying around those items in anticipation of a future robbery. The court finds that the connection between the CI's statements—the only evidence that a crime had been committed—and the alleged crime of conspiracy to commit armed robbery is too tenuous to support probable cause without additional evidence.

### ii. Corroboration of the CI's Statements as Defendants Prepare to Commit the Crime

Courts often uphold searches based on a CI's tip when law enforcement can observe that the defendants are clearly about to commit or have just committed the crime predicted by the CI. The Fourth Circuit addressed such a case in United States v. Fisher, 97 F.3d 1449 (4th Cir. 1996) (unpublished), which involved a warrantless arrest based on a tip from an unproven informant. The CI had warned DEA agents that the defendants planned to commit murder that very evening. The CI described the appearance of the defendants and asserted that they would depart from a particular address at 7:30 AM in a gold Ford Taurus, Maryland tag BCD 097, and travel to Baltimore County to commit the murder. The police kept watch over the defendants the night before their intended departure. At about 7:30 AM the following morning,

25

the officers observed a gold Taurus with that same license plate arrive at the address the CI had indicated and pick up another man who matched the description the CI had previously given. The car headed into the city of Baltimore, and the police pulled the car over about ten miles from the city for fear that they might lose the car in rush hour traffic. The court found that "the police officers had sufficiently corroborated specific facts to rely on the informant's tip, which gave them probable cause to make the warrantless arrests." Fisher, 97 F.3d at *3.

Similarly, the Eleventh Circuit upheld a district court's denial of a suppression motion in United States v. Garcia, 433 F. App'x 741 (11th Cir. 2011) (unpublished), in which the defendants were indicted for conspiracy to commit robbery after a warrantless search of their vehicles. The defendants in Garcia, along with a CI and an undercover agent, had conspired to rob a drug dealer's stash house. The CI and undercover agent informed police that the robbery was to occur on a particular date and that the defendants planned to use firearms and fake police uniforms during the robbery. On the exact date on which the robbery was supposed to occur, police officers stopped the defendants as they were on their way to commit the robbery. Before stopping the defendants, the officers had hear them say, "so the Hummer can park over there with those things, you copy me?" Garcia, 433 F. App'x, at *1. Given the context of this statement, the officers interpreted it as a reference to the firearms and fake police uniforms to be used in the robbery. The officers then searched the Hummer, which the court found to be "lawful under the automobile exception to the Fourth Amendment's warrant requirement because the agents had probable cause to believe that the weapons for the robbery would be found in that

vehicle." Id. at *2; see also United States v. Trantham, 446 F. App'x 339, 343 (2d Cir. 2011) ("We find no error in the district court's conclusion that this exception applied because the [vehicle] was readily movable and had been used to transport at least one conspirator to multiple meetings, as well as the duffel bags that were to be used to transport the cash and drugs that were to be stolen.").

Whitfield monitored King's house on Wednesday, May 31 and Thursday, June 1, presumably in an effort to ensure that King did not commit the armed robbery.  Yet, in contrast to Fisher and Garcia, Whitfield did not observe Carter doing anything in furtherance of the conspiracy to rob the hotel on either May 31, the date for which the robbery had been planned, or on June 1, the date on which Carter was searched and arrested.  In Fisher the officers observed multiple activities that corroborated the CI's statement—that on the very day that the crime had been planned, the designated car with correct plates arrived at the designated house at the correct time, and then drove off with men matching the CI's prior description, towards that city that the CI had predicted—none of which occurred in the current case.  Similarly, Carter's case does not involve a search on the date he was scheduled to commit the robbery while he was on his way with his known co-conspirators to commit said robbery, like in Garcia.  It does not involve officers overhearing him and his co-conspirators talking about how the "things" that were to be used in the robbery could be found in the particular car that was searched.  If, like in Fisher and Garcia, the officers had stopped Carter while he was en route to the Economy Inn and Suites to commit the robbery, rather than parked in front of the Money Man Pawn shop three miles away, then the surrounding circumstances of the search and arrest likely would

have combined with the CI's statements to support probable cause for the search.  Or had Whitfield observed King loading the gun, zip ties, and masks—or bags which could reasonably contain those items—into the vehicle on the days that he kept watch outside King's house, then the court could likely find that he had probable cause to believe that the vehicle contained evidence of the conspiracy to commit the robbery.  See United States v. Alicea, 2017 WL 3122560 (D. Mass. July 21, 2017) (finding probable cause to search a vehicle for contraband when the officers saw the defendant place a suitcase in the vehicle after their observations had already confirmed several other details of the CI's tip about the drug-smuggling operation).  However, the government has not put forward any evidence that Whitfield observed anything on the day that he searched Carter's vehicle to confirm the CI's prior statements that Carter had planned to commit armed robbery, or to support the idea that he would have had the tools for the robbery in his vehicle at the time of the search.

### iii. Corroboration of the CI's Statements Through Observation of Criminal Activity

Courts have also upheld searches based on a CI's tip where the officers observed the defendants engaging in obviously illegal behavior related to the tip.  In United States v. Dorlouis, 107 F. 3d 248 (4th Cir. 1997), the Fourth Circuit upheld the district court's denial of a motion to suppress evidence that was discovered during a warrantless arrest and search.  Dorlouis, 107 F.3d at 256.  The court found that probable cause existed to believe that the defendants were engaging in a drug transaction based on information from a CI who had been used several times before and corroboration of the crime by law enforcement.  The CI was given money by the officers to carry out drug transactions, which the officers were able to overhear

through the recording device donned by the CI. The officers observed the defendants leaving the CI's apartment after the drug transaction, at which point the officers stopped and arrested the defendants and searched their vehicle under the "search incident to arrest" exception to the warrant requirement. The court found that probable cause existed for the arrest of the occupants of the car and for the search of the vehicle. Id.

The Fourth Circuit likewise upheld a warrantless vehicular search in United States v. Brookins, 345 F.3d 231 (4th Cir. 2003), finding that "the police had probable cause to search [the defendants'] vehicle and that the [automobile] exception applie[d]." Brookins 345 F.3d at 233. First, the officers had "recently received reliable confidential information that [the defendant] frequently made trips to [the particular] intersection [where the officers were on patrol] to distribute narcotics." Id. The officers knew that the defendant had previously been convicted of drug offenses and was the subject of an ongoing narcotics investigation. After the defendant exited the vehicle that his wife was driving to talk to someone near the car, the officers observed the defendant reach back into his vehicle and hand the other person a clear plastic sandwich bag. The officers apprehended both men and discovered that the bag contained crack cocaine. Although the defendant's wife fled with the car from which the drug deal had been made, soon afterwards the officers observed the same car parked in the driveway of a home belonging to the wife's mother. The officers searched the vehicle and found further incriminating evidence. The Fourth Circuit overruled the district court's finding that "probable cause became stale during the fifteen-minute interval between the officers' arrest of [the defendant] and subsequent

seizure of his Ford Expedition from his mother-in-law's driveway." Id. at 236. The Fourth Circuit found that the probable cause that arose from the CI's tip and the officers' observation of the drug deal did not become stale, but rather that "the police officers had probable cause to conclude that there was contraband in the vehicle, as the party responsible for the vehicle's flight, [the defendant's] wife, was present on the scene." Id. at 238

Comparing these cases to the current motion to suppress, the officers did not overhear Carter conspiring to commit a robbery with the CI or observe Carter leaving a location in which he had clearly been engaging in illegal activity, as in Dorlouis. Unlike the CI in Dorlouis, who had proven her reliability on prior occasions, these officers had never before used the CI as an informant. They did not know whether Carter, or even the man previously identified as King, had a prior record for committing any crime, as in Brookins. Unlike Brookins, where the officers observed the defendant conducting a drug deal out of his vehicle a mere 20 minutes before they found and searched the vehicle, Whitfield did not see Carter doing anything that would indicate that he was preparing to commit armed robbery or that evidence of the robbery conspiracy would be in his car. The government might try to argue that this case supports its claim that the probable cause that arose from the CI's statements had not gone stale by the time the officers searched Carter's vehicle the day after the planned robbery. However, the probable cause in Brookins was based on substantial corroboration of the CI's statements, which did not occur in the case before us. As such, Brookins does not aid the government's case.

Thus, the court finds that, based on the totality of the circumstances, the warrantless search of Carter's vehicle was not supported by probable cause and violated his Fourth Amendment rights.

### III.  CONCLUSION

Based on the foregoing, the court **GRANTS** the motion to suppress.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**December 28, 2018**
**Charleston, South Carolina**