**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | Criminal. No.: 2:18-257 |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | **SENTENCING MEMORANDUM** |
| Larry Edwards Carter, Jr., | ) | **AND REQUEST FOR** |
| | ) | **DOWNWARD VARIANCE** |
| Defendant. | ) | |
| | ) | |

**I.     Introduction**

Larry Carter asks this Court to vary downward from his career offender guideline range of 151-188 months because 1) the guidelines yield an excessive sentence, and 2) the career offender guideline should be disregarded because it was implemented without institutional expertise or empirical analysis. This Court is free to vary from the guidelines based on an individualized determination that the guidelines yield an excessive sentence in a particular case or based on policy considerations. *See Kimbrough v. United States,* 552 U.S. 85, 93 (2007), and *Spears v. United States,* 555 U.S. 261, 264 (2009).

The guidelines are only "one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States,* 552 U.S. 85, 90 (2007). They are to be read as "effectively advisory." *United States v. Booker,* 543 U.S. 220, 244 (2005). Furthermore, a sentencing court can "reject guideline provisions on categorical, policy grounds—particularly when those guideline provisions "do not exemplify the Commission's exercise of its characteristic institutional role, and may, consequently, adopt some other well-reasoned basis for

sentencing." *United States v. Newhouse,* 919 F. Supp. 2d 955, 966 (N.D. Iowa 2013)(internal citations omitted).

**II.     A guideline range sentence of 12-15 years is excessive punishment for possession with intent to distribute 3.4 grams of heroin.**

Larry Carter is designated a career offender based on convictions when he was 18 and 19. PSR ¶¶ 26, 29[1]. Because of this designation, his guideline range is 151-188 months in prison. PSR ¶ 72. A sentence in this range would violate the parsimony principle and would not serve the goals of 18 U.S.C. § 3553 (a).

Title 18 U.S.C. § 3553 (a) sets out the factors a court should consider at sentencing. These factors are preceded by the parsimony principle, "a broad command that instructs courts to impose a sentence sufficient, but not greater than necessary, to comply with" the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation. *Dean v. United States,* 137 S.Ct. 1170, 1175 (2017). The statute then directs the court to consider the nature and circumstances of the offense, the history and characteristics of the defendant, just punishment, deterrence, training or correctional treatment, the kinds of sentences available, the guideline range, any pertinent policy statements, and unwarranted sentence disparities. 18 U.S.C. § 3553(a).

   A.     *The history and characteristics of Larry Carter. 18 U.S.C. § 3553 (a)(1)*

In April 2001 when Larry Carter was 18 years old, North Charleston Police bought .097

---

[1] Although the PSR states his age was 20 on 7/31/2003, the offense conduct for Mr. Carter's first 924(c), count 4, occurred on July 8, 2002. At that time he was 19.

2

grams of crack from him within a half-mile of a school. PSR ¶ 26. This resulted in a conviction for distribution of crack in proximity of a school. *Id.* In July 2002 when he was 19, he was stopped and caught with a Hi-Point handgun and 7.81 grams of crack. PSR ¶ 29. This resulted in a conviction for possession of a gun in furtherance of a drug trafficking crime, and a conviction for felon in possession.

Mr. Carter has already been punished severely for both of these crimes. For the distribution within proximity of a school charge he was sentenced to a Youthful Offender Sentence. PSR ¶ 26. For the possession of a gun in furtherance of a drug trafficking crime he served a 144-month sentence—an 84-month term for being a felon in possession for the same gun followed by a consecutive 60 months. PSR ¶ 29.

That 144-month sentence sent Mr. Carter to federal prison as a 21-year old. He did not emerge until he was 31. In that time, Mr. Carter learned lessons centered around surviving in prison. He learned whom he could and could not sit with at meal times. He learned how to look out for himself and how to occupy his mind and strengthen his body through exercise. He tried to prepare himself for life outside of prison with the programs offered by the Bureau of Prisons, earning his GED in 2005, receiving his EPA certification for hazardous materials, training in HVAC systems, completing OSHA certification classes, and receiving a certificate in fitness training.

When he was finally released to a residential reentry center in 2014, he found himself ill-prepared for life outside prison walls. In addition to the fact that society had changed around him, he had essentially lost 10 years of psychological growth in service of punishment. Where his friends were now married with families, jobs, and mortgages, Mr. Carter struggled to find

employment. In spite of his earned certifications, no one wanted to hire him. Eventually, fortunately, he found work through a temp agency with Thompson Industrial Services, where he worked as a janitor at the Nucor Steel Plant in Huger, SC. In hindsight, Mr. Carter knows he had a great job. It let him pay bills and support himself.

This job, coupled with the moderating influence of his girlfriend Tiffany, kept Mr. Carter mostly out of trouble for 2 years. Besides a disorderly conduct and citations for driving violations (for these violations this Court added 25 hours of community service to his conditions), he did well, focusing on work, Tiffany, and his now-teenage daughter Shakayla. However, after a while he began to argue with Tiffany about his spending. Mr. Carter would waste money gambling. This lead to fights over paying for expenses. Eventually, Mr. Carter and Tiffany separated and Mr. Carter began spending time with different women. He began to use drugs recreationally. This, in turn, led to violations of the conditions of his supervised release.

On February 2016 Mr. Carter tested positive for cocaine multiple times. His conditions were modified to have him participate in a cognitive behavioral treatment program. ECF 121. He continued to test positive in March, and probation filed a motion to show cause for a revocation of supervised release. ECF 122. At his final hearing, the proceedings were continued. ECF 136.

On September 15, 2016 the court took the violations under advisement, and Mr. Carter was continued on supervised release for another 6 months. ECF 140.

On November 1, 2016, Mr. Carter began participation into the Reentry Court Program. (REAL). He stayed in the REAL court program until June 2017 when he was arrested by the

North Charleston Police Department for gun and drug charges on June 1, and a drug charge on June 6.  On January 17, 2018 Mr. Carter's federal bond was revoked, and on March 13, 2018 his case was federally indicted.  Mr. Carter has remained in custody since June 6, 2017.

While he has been in jail Mr. Carter has suffered significant and tragic losses. In November 2018 his youngest brother William was murdered in a drive-by shooting.  Mr. Carter was distraught over not being able to take care of his family during this time.  Three months later Mr. Carter's favorite aunt died of cancer.  She had been in remission for a year, but when she found out her cancer had returned she passed within a matter of months.

  *B.*  *The facts of the case 18 U.S.C. § 3553 (a)(1)*

On January 29, 2019 Mr. Carter pled to count 4 of his indictment, possession with intent to distribute heroin.[2]  ECF 56.  Mr. Carter was the driver of a car stopped in the middle of a roadway on June 6, 2017.  PSR ¶ 12.  When the car drove away, police stopped the car and after a brief conversation arrested Mr. Carter for a federal warrant stemming from the events of June 1, 2017.  *Id.*  A search incident to arrest revealed 3.45 grams of heroin, 1.84 grams of crack and 5 sleep medication pills.  *Id.*

No gun was recovered from this date.  Mr. Carter was cooperative and polite.  His PSR holds him responsible for the conduct for all counts, not just the conduct for Count 4 from June 6, 2017.  The PSR attributes to him the .2 grams of morphine and 6 alprazolam pills from June 1, 2017, and the 3.45 grams heroin, and 1.84 grams crack from June 6, 2017.  PSR ¶ 10, 12.  In total, these drugs are the equivalent of 10.141 grams of marijuana.  PSR ¶ 12, 13.  Mr. Carter

---

[2] This Court ordered the evidence for counts 1-3 suppressed on December 28, 2018.  ECF 51.

also received enhancements for possessing a gun on June 1, 2017[3] and for committing this conduct while on supervised release.[4]  PSR ¶ 46, 49.

For all of this conduct, Mr. Carter's adjusted offense level is 19.  PSR ¶ 50.  With acceptance for responsibility, his total offense level would be 16.  If he were not considered a career offender, Mr. Carter's criminal history score total is 8, which would place him in criminal history category IV.  His non-career criminal guidelines would be offense level 16, criminal history category IV, which results in a guideline range of 33-41 months.

Unfortunately, the two convictions Mr. Carter received as an 18 and 19-year old have been used to designate him a career offender.  The distribution of .097 grams of crack in proximity of a school has been categorized as a serious drug offense.  PSR ¶ 26.  The possession of a gun in furtherance of a drug trafficking crime has been categorized as a violent felony, although there were no allegations of violent behavior in the facts of the case.  PSR ¶ 29.  Because of these convictions, Mr. Carter's guideline range becomes 151-188 months, increasing his guideline range 5 fold.  PSR ¶ 72.

The consequences of these prior convictions are disproportionally severe to Mr. Carter's conduct.  A sentence of over a decade is not just punishment for possession with intent to distribute 3.45 grams heroin and 1.84 grams crack from June 6, 2017.

Furthermore, the career offender guideline does not account for the fact that as Mr. Carter gets older, the chances of him recidivating decrease.  Based on statistical analyses over a fifteen-

---

[3] Mr. Carter has objected to this enhancement, but acknowledges for the purpose of this memorandum that it has been applied in his presentence report.
[4] Mr. Carter also faces a supervised release guideline of 46-57 months based on his guilty plea on this case.

year period, the Sentencing Commission has found that "[r]ecidivism rates decline relatively consistently as age increases. Generally, the younger the offender, the more likely the offender recidivates." U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12 (May 2004). Offenders over the age of 50 have a recidivism rate of 9.5 percent, while offenders under age 21 have a recidivism rate of 35.5 percent. *Id.* at 28.

### III.    The career offender guideline should be disregarded because it was implemented without the Sentencing Commission's institutional expertise or empirical analysis.

With the career offender guideline, Congress wanted to target repeat drug offenders and repeat violent offenders.  S. Rep. No. 98-225, at 175 (1983).  Congress saw drug trafficking as an "extremely lucrative" enterprise where "drug traffickers often have established substantial ties outside the United States from whence most dangerous drugs are imported into the country." *Id.* at 20, 256.  To achieve this goal, the Commission "did not use empirical data of average sentences, pre-guidelines, as the starting point for the Career Offender Guideline." *United States v. Newhouse,* 919 F.Supp.2d 955, 973 (N.D. Iowa 2013).  Instead, much larger increases were implemented consistent with legislative direction rather than pre-guidelines practice. *Id.*  The end result was that

> Career Offender sentencing ranges were set at or near the maximum term, regardless of whether the resulting sentences met the purposes of sentencing, created unwanted disparity, or conflicted with the "parsimony provision" of § 3553(a), which directs judges to impose a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing

*Id.*

7

Amendments to the career offender guideline only expanded its reach without concern for the goals of § 3553 (a) or empirical data—"The amendments added drug offenses…untethered from the requirements of § 994 (h) and not the product of any study, empirical research, or sentencing data, though the sentencing data clearly indicated there was a problem." *Id.* at 973. Because of this, the Court in *Newhouse* found the career offender guideline "results from an imprecisely implemented congressional mandate and is entitled to considerably less deference than those guidelines where the Sentencing Commission has exercised its institutional expertise and utilized empirical analysis." *Id.* at 974.

The problem of this heedless and ill-considered expansion of the career offender guideline is illustrated in Mr. Carter's case. When he was arrested on June 1, 2017, nothing was located on his person. A single Smith and Wesson was found in the car, along with ammunition, pills, and less than .10 grams of crack. PSR ¶ 10. When he was arrested on June 6, 2017, 3.45 grams of heroin, 1.84 grams of crack, and 5 sleeping pills were found. There were no guns. A sentence within Mr. Carter's career offender guideline range would certainly punish him, but to what end? He is not the drug trafficker engaged in an extremely lucrative enterprise with substantial ties outside the United States to allow the importation of dangerous drugs. Instead, he is a 36 year-old black man who spent a decade of his young adulthood learning life lessons from other criminals. Unlearning that behavior will not happen with another decade-long sentence.

### III.    Conclusion

Mr. Carter will be 37 in November. During the pendency of his case he has exhibited a genuine faith in the justice system and the constitution. He has been a respectful and diligent

client, conducting his own research while heeding the advice of counsel.  Upon his release he plans on beginning a commercial cleaning service.  He is inspired by his younger, murdered, brother, who had a good job at a construction company and bequeathed  some of his life insurance to Mr. Carter.  It is Mr. Carter's plan to honor his brother by using these funds to start his own business and live an honest and productive life.

He understands that a sentence of some period of imprisonment is likely, but asserts that a sentence within his career offender range is more punitive than necessary to achieve the aims of the factors listed in 18 U.S.C. § 3553 (a).  He asks this Court to consider varying downward, somewhere in-between the sentence he would receive were he not considered a career offender and his current guidelines.  A total sentence of even 72 months would result in his imprisonment into his early 40s.  This sentence would be an appropriate and just one, punishing him for his mistakes but not for so long as to do so at the expense of his future.

Respectfully submitted,

*/s/ Alicia Vachira Penn*
Alicia Vachira Penn
Assistant Federal Public Defender
145 King Street, Suite 325
Post Office Box 876
Charleston, SC 29402
Attorney ID# 11825

October 27, 2019